**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| CHRISTOPHER AND PAULA ANDREW, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 6:12-cv-03081-RED |
| BLH DEVELOPMENT | ) | |
| COMPANY, LLC, et al. | ) | |
| | ) | |
| Defendants. | ) | |

<u>**REPLY  SUGGESTIONS IN SUPPORT OF ALL**</u>
<u>**DEFENDANTS' MOTION TO DISMISS**</u>

Michael K. Cully      MO 26794
Angela K. Drake       MO 35237
Aaron M. Klusmeyer  MO 63006
LOWTHER JOHNSON
901 St. Louis, 20th Floor
Springfield, Missouri  65806
(417) 866-7777 – Telephone
(417) 866-1752 – Facsimile
mcully@lowtherjohnson.com
adrake@lowtherjohnson.com

ATTORNEYS FOR DEFENDANTS

# TABLE OF CONTENTS

I.      RESPONSE TO PLAINTIFF'S FACTS .............................................................6

II.     ARGUMENT .............................................................................................8

        A.      The Condominium Purchases are Not Securities .............................8

        B.      Plaintiffs Fail to Satisfy the Pleading Requirements ....................12

        C.      Plaintiffs' State Law Fraud Claims Fail as a Matter of Law..........14

        D.      The Merchandising Practices Act Claim Fails................................22

        E.      Defendants were not Fiduciaries ...................................................22

        F.      Plaintiffs Claim Against Defendant Huffman must be dismissed ...24

        G.      Plaintiffs' Claims against Hilton Fail............................................24

        H.      Plaintiffs' Waived Their Right to a Jury Trial ...............................25

        I.      Plaintiffs' Claims Are Barred by the Statutes of Limitations..........25

                1.      Counts I, II and IV are Time Barred ...................................26

                2.      Plaintiffs' Inquiry Notice at the Time They Signed the CPA's Bars
                        Counts III and V .................................................................27

                3.      Plaintiffs State Law Fraud Claims are Time Barred ...........28

III.    CONCLUSION ......................................................................................36

Case 6:12-cv-03081-DW   Document 45-1   Filed 10/22/12   Page 2 of 37

# TABLE OF AUTHORITIES

**Cases**

*Allison v. Ticor Title Ins.*, 907 F.2d 645 (1990) ............................................................. 7

*Anselmo v. Manufacturer's Life Insurance Co.*, 771 F.2d 417 (8th Cir. 1985) ...................... 15, 18

*Armbrister v. Roland International Corp.*, 667 F.Supp. 802 (M.D. Fla. 1987) ...................... 30, 31

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................... 22

*Bohac v. Walsh*, 223 S.W.3d 858 (Mo. Ct. App. E.D. 2007) ....................................... 14

*Bowles v. All Counties Inv. Corp.*, 46 S.W.3d 636 (Mo. Ct. App. S.D. 2001) ............................ 12

*Brown v. Irving-Pitt Mfg. Co.*, 292 S.W. 1023 (Mo. 1927) .......................................... 33

*Cohen v. New Growth*, 385 F.Supp.2d 935 (D.S.D. 2005) ........................................... 25

*Community Title Co. v. U.S. Title Guar. Co.*, 965 S.W.2d 245 (Mo. Ct. App. E.D. 1998) .......... 27

*Corley v. Jacobs*, 820 S.W.2d 668 (Mo. Ct. App. E.D. 1991) ...................................... 28

*Cullom v. Crittenton*, 959 S.W.2d 915 (Mo. Ct. App. 1998) ......................................... 32

*Dancin Dev., L.L.C. v. NRT Missouri, Inc.*, 291 S.W.3d 739 (Mo. Ct. App. E.D. 2009) ............. 21

*DeMarco v. LaPay,* 2009 WL 3855704 (D. Utah 2009) ............................................ 15

*Fargo Partners v. Dain,* 540 F.2d 912 (8th Cir. 1976) .............................................. 7, 8

*Finkel v. The Stratton Corp.*, 962 F.2d 169 (2nd Cir. 1992) ....................................... 24

*Garcia v. Santa Rosa*, 528 F.Supp.2d 1283 (S.D. Fla. 2007) ....................................... 15

*Gilmore v. Chicago Title Ins. Co.*, 926 S.W.2d 695 (Mo. Ct. App. E.D. 1996) ........................ 27

*Golden v. Nat'l Utilities Co.*, 201 S.W.2d 2927 (Mo. 1947) ...................................... 17, 18

*Great Rivers Coop. of Southeastern Iowa v. Farmland*, 120 F.2d 893 (8th Cir. 1997) ............... 25

*Grossman v. Thoroughbred Ford, Inc.*, 297 S.W.3d 918 (Mo. Ct. App. W.D. 2009) ........... 17, 18

Case 6:12-cv-03081-DW   Document 45-1   Filed 10/22/12   Page 3 of 37

*Hasenyager v. Bd. of Police Com'rs of Kansas City*, 606 S.W.2d 468 (Mo. Ct. App. W.D. 1980) ................................................................................................................................ 32

*Hess v. Chase Manhattan Bank USA,* 220 S.W.3d 758 (Mo. banc 2007) .................................... 14

*Hocking v. Dubois*, 885 F.2d 1449 (9th Cir. 1989)................................................................. 6, 7, 8

*Lingo v. Hartford Life Insurance*, 2011 WL 1642223 (E.D. Mo. May 2, 2011) .................... 17, 18

*Lucas v. Enkvetchakul*, 812 S.W.2d 256 (Mo. Ct. App. S.D. 1991)............................................. 21

*Luli Corp. v. El Chico Ranch, Inc.*, 481 S.W.2d 246 (Mo. 1972) .......................................... 17, 18

*Massie v. Colvin*, 2012 WL 177591 (Mo. Ct. App. S.D. Jan. 23, 2012) ...................................... 12

*Meadows v. Pac. Inland Secs. Corp.*, 36 F.Supp.2d 1240 (S.D. Cal. 1999)................................. 24

*Merck & Co., Inc. v. Reynolds*, 130 S.Ct. 1784 (2010) ............................................................... 25

*Nerman v. Alexander Grant & Co.*, 926 F.2d 717 (8th Cir. 1991)......................................... 28, 29

*Ringstreet Northcrest Inc. v. Bisanz*, 890 S.W.2d 713 (Mo. Ct. App. W.D. 1995)............... 17, 18

*Rissman v. Rissman*, 213 F.3d 381 (7th Cir. 2000)....................................................................... 15

*Ritchey v. Horner*, 244 F.3d 635 (8th Cir. 2001) ........................................................................ 25

*S.E.C. v. Rubera*, 350 F.3d 1084 (9th Cir. 2003).......................................................................... 6

*S.E.C. v. W.J. Howey*, 328 U.S. 293 (1943)....................................................................... 4, 6, 7, 8

*Saey v. CompUSA, Inc.*, 174 F.R.D. 448 (E.D. Mo. 1997)......................................................... 20

*Salameh v. Tarsadia Hotels*, 2011 WL 1044129 (S.D. Cal. 2011).............................................. 9

*Schultz v. Dain,* 568 F.2d 612 (8th Cir. 1978) .............................................................................. 8

*Schwartz v. Lawson*, 797 S.W.2d 828 (Mo. Ct. App. W.D. 1990) .............................................. 27

*Sharpe v. Sharpe*, 243 S.W.3d 414 (Mo. Ct. App. E.D. 2007)........................................ 27, 28, 33

*Shelter Mut. Ins. Co. v. Crunk*, 102 S.W.3d 560 (Mo. Ct. App. S.D. 2003) .............................. 19

*Summerhill v. Terminix Inc.* 637 F.3d 877 (8th Cir. 2011)......................................................... 24

3

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ............................................. 10

*Warren v. Paragon Tech. Group, Inc.*, 950 S.W.2d 844 (Mo. banc 1997) ........................... 17, 33

*Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981) ...................................................... 8

**Statutes**

MO. REV. STAT. § 137.016 ................................................................................................ 12

MO. REV. STAT. § 339.710 ................................................................................................ 21

MO. REV. STAT. § 339.710(23) ......................................................................................... 21

MO. REV. STAT. § 339.720 ................................................................................................ 21

MO. REV. STAT. § 339.730 ................................................................................................ 21

MO. REV. STAT. § 339.740 ................................................................................................ 21

MO. REV. STAT. § 339.755 ................................................................................................ 21

MO. REV. STAT. § 339.755.1 ............................................................................................. 21

MO. REV. STAT. § 339.840 ................................................................................................ 21

MO. REV. STAT. § 339.860 ................................................................................................ 21

MO. REV. STAT. § 516.100 ................................................................................................ 27

MO. REV. STAT. § 516.120(5) ........................................................................................... 27

**Other Authorities**

*SEC No Action Letter to Marco Polo Hotel Inc.*, 1987 WL 108553 (Sept. 30, 1987) .................. 9

*SEC No-Action Letter to Diamond Cove Assoc.*, 1990 WL 287055 (Sept. 27, 1990) ................. 10

*SEC No-Action Letter to FC Beach Joint Venture*, 1998 WL 278529 (May 29, 1998) ............... 9

*SEC No-Action Letter to Intrawest Corporation*, 2002 WL 31626919 (Nov. 8, 2002) ............... 9

*SEC No-Action Letter to One Central Park West*, 1995 WL 648105 (Nov. 2, 1995) ................. 10

SEC Release 5341 ........................................................................................................ 7, 8, 10

**Rules**

F.R.C.P. 9(b) ................................................................................................ 11, 12

**Treatises**

18 Missouri Practice § 11:6 .......................................................................... 21

20 Ruling Case Law, pp. 346-347 ................................................................ 17

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**COME NOW**, the Defendants in the above captioned matter and for their Reply in Support of their Motion to Dismiss, state as follows.[1]

## I.     RESPONSE TO PLAINTIFF'S FACTS

Plaintiffs Suggestions in Opposition closely track the brief filed in *Obester* and the same result should follow: most, if not all, claims are time barred and Plaintiffs fail to state claims for which relief may be granted.

It is important to remember, as reflected in the General Summary and Commonly Asked Questions document ("FAQ"), the Purchaser's Acknowledgment and the UMA, [all described in the FAC and attached thereto] the rental program was not mandatory. As a result, and as explained in the original *Obester* Order on the Motion to Dismiss, Doc. No. 45 at pp 7-8, Plaintiffs could not expect profits from the efforts of others as required by the Supreme Court's test in *S.E.C. v. W.J. Howey*, 328 U.S. 293 (1943). In short, no "security" is at issue. *Obester*, Doc No. 45 and Doc. No. 90 (07/25/12)[denying Plaintiffs' Motion to Reconsider].

To the extent Plaintiffs claim "defendants cleverly drafted sales documentation," the fact of the matter is that Plaintiffs read and signed this sales documentation and cannot now escape the reality of what was explained to them in writing.  In short, the proper analysis, under any authority, requires consideration of the actual documents Plaintiffs executed.

In their opening, Plaintiffs selectively cite portions of the Declaration governing the condominiums in an effort to argue the Declaration "severely restricts use and access to the unit in a way to make it impracticable if not impossible to use the unit for anything other than a hotel room in the Hilton rental program."  Exhibit 5 to the FAC contains the Declaration which governs the condominiums.  It provides, in Paragraph 3.2, that a rental program *may* be used by

---

[1] Defendants preserve all defenses not expressly set out in the Motion to Dismiss.

the Unit Owner (Plaintiffs here). Nothing in the Declaration limits the Unit Owners' individual use of the condominium and nothing in the Declaration requires that a unit be placed in any particular rental program. Indeed, the Declaration provides Owners may rent their units on their own, apart from the rental program. *See* Declaration, ¶ 3.2(3).[2] That the Declaration later describes the manner in which maintenance and common expenses are to be handled is of little relevance. Maintenance and common expenses are part and parcel of a condominium purchase and do not automatically create the existence of a "security."

Plaintiffs also cite the UMA in this section in a continuing effort to show access to the condominiums was restricted but fail, again, to acknowledge that each Owner could enter the UMA *at his or her own discretion* – rental was plainly not a requirement of ownership, nor a condition accompanying the purchase of the condominium which, in the majority of cases, occurred years earlier. Def. Ex. C, ¶ 22; Def. Ex. D. Moreover, the Unit Owner retained substantial control over the unit, as the UMA was for a five-year renewable term, and could be terminated upon default of the Manager, by the Unit Owner, with 60 days notice. Def. Ex. C, ¶¶ 3, 19.

Finally, Plaintiffs' "Facts" complain of the fifty percent revenue split and the ongoing "expenses, utilities, cleaning fees, maintenance, condominium association fees, and the like." Plaintiffs further complain they must pay "taxes, insurance and mortgage payments," allegedly causing a loss. These allegations do not transform a real estate asset into a security. Additionally, these allegations cannot support a state law fraud claim because each of these items was expressly disclosed in the UMA, which Plaintiffs willingly chose to sign. *Id*. at ¶¶ 4-7; s*ee also* Exs. 4, 5 to UMA which reflect various fees and costs.

_____

[2] In such an event, the Unit cannot be rented to the same person for more than a thirty day period. *See* Declaration, ¶ 3.2(5).

In short, Plaintiffs' conclusion that they bought a "hotel room," does not *ipso facto* lead to the conclusion they bought a "security." Additionally, later voluntary participation in a rental program with a different entity does not mean Plaintiffs purchased a "security." If Plaintiffs did not want to put their units in the rental program, and agree to pay the expenses, cleaning fees, "and the like" while paying taxes, insurance and mortgage payments, they should not have entered into the UMA. That they did, and now claim a loss because they are not making enough money in rental income, does not mean Defendants should be found liable for federal securities fraud or any other claim.

## II.   ARGUMENT

### A.   The Condominium Purchases are Not Securities

Plaintiffs, as they did before in *Obester*, cite *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293 (1946); *S.E.C. v. Rubera*, 350 F.3d 1084 (9th Cir. 2003); and *Hocking v. Dubois*, 885 F.2d 1449 (9th Cir. 1989) as support for the proposition that "sellers cannot escape securities registration requirements by separating documents into multiple transactions." *Howey,* of course, is the seminal case, discussed in Judge Dorr's original *Obester* Order, and in the Order on the Motion to Reconsider. *Howey* involved a situation in which the companies were "offering something more than fee simple interest in land." 328 U.S. at 299. Here, the Developer offered a fee simple interest in a condominium and nothing more, as reflected in the Purchaser's Acknowledgements quoted verbatim in the opening brief.

*Rubera* involved pay telephones and service agreements which were marketed and sold as a "package." Again, as reflected in the documents signed by the Plaintiffs and set out in the opening brief, no packaging occurred here. To the contrary, no guarantees about rental income were made, and the rental program was optional as reflected in every document Plaintiffs signed.

*Hocking*, a Ninth Circuit case, involved condominiums in Hawaii sold by a broker in the secondary market. At issue was whether the broker could be liable under the federal securities laws. Ironically, the SEC argued SEC Release 5341, cited by Plaintiffs in Count I of the FAC, was not applicable, as the case involved a broker, not a developer. The Ninth Circuit concluded the SEC view was to be accorded "no special weight." *Hocking* was a 6/5 decision, criticized by other courts, including the Seventh Circuit. *See Allison v. Ticor Title Ins*., 907 F.2d 645 (1990).

*Hocking* is distinguishable in numerous respects,[3] but at best, even *Hocking* requires an examination of the promotional materials and contractual agreements be conducted. Here, that means the FAQ, the CPA, which referenced the Purchaser's Acknowledgments and the Original Sales Certificate, the Declaration, and the UMA, none of which Plaintiffs squarely address in their brief. *Hocking* did not involve contract documents in which the buyers expressly acknowledged "no rental pooling" and "no income guarantees." In fact, the *Hocking* majority stated the case presented facts which were different from the "everyday situation where a real estate agent or broker merely provides information to the purchaser regarding the availability of a rental pool or shared amenities…or the situation where, after a purchase and separate from any inducement to purchase, a real estate agent arranges for a rental pool." 885 F.2d at 1458.

Contrary to the position taken by the Ninth Circuit in *Hocking*, the Eighth Circuit has held, twice, that the purchase of real estate and the related entry into a management agreement does not satisfy *Howey's* requirement of an "expectation of profits solely from the efforts of others." In *Fargo Partners v. Dain,* 540 F.2d 912 (8th Cir. 1976), the Court analyzed a management contract that could be terminated on thirty days notice. This ability to terminate the

---

[3] *Hocking* unequivocally dealt with rental "pooling," which Plaintiffs do not and cannot claim here. *See, e.g.,* UMA, ¶¶ 21-22. Additionally, in *Hocking,* the Rental Pooling Agreement was signed within days of the Purchase Contract.

Case 6:12-cv-03081-DW   Document 45-1   Filed 10/22/12   Page 10 of 37

agreement established the fact the owner of real estate retained substantial control over the asset, such that *Howey's* third prong could not be satisfied. In *Schultz v. Dain,* 568 F.2d 612 (8th Cir. 1978), the Court reached the same conclusion when the management agreement contained a three year non renewable term.[4]

Here, Plaintiffs' UMAs contain a five year term, and provide termination upon default by the Manager on sixty days notice. Ex. 4, ¶¶ 3, 19. In keeping with the analysis in the *Dain* cases, the Owner of the Unit could choose <u>not</u> to put his real estate in the rental program, or could rent it on his own, as fully described in the Declaration and the contract documents. See Ex. 8, ¶ 3.5.3; Ex. 3A, #7; and Ex. 4, #22. The Owner had complete and unilateral control over the condominium once it was purchased.

In sum, the *Howey* test cannot be satisfied on these facts, under the law in this Circuit. As the Court can see from the dates of the CPAs versus the UMAs (*see* Ex. D), the UMAs were signed in most cases years after Plaintiffs bought the condominiums. Accordingly, if the UMA is the source of an expectation of profits, as Plaintiffs' brief now appears to contend, then at the time Plaintiffs bought the condominiums, they did not have any expectations of profits from the efforts of others because they had yet to enter into the UMA.[5] SEC Release 5341 unequivocally requires that agreements be "coupled" (Def. Ex. 1, pg. 2,*3) and no coupling occurred here.

---

[4] Similarly, in *Williamson v. Tucker*, 645 F.2d 404, 424, n. 5 (5th Cir. 1981) the court explained the need to focus on the investor's expectations at the time of the *original* investment, not at a later time when there was a decision to delegate duties.

[5] This conclusion illustrates the importance of the pleading standards applicable to this matter and the necessity for preciseness in the Complaint. Plaintiffs unequivocally allege in the FAC that the CPA is the "security" (*see, e.g.,* FAC ¶ 383), but now, in their brief, rely on the UMA. If the UMA is now the "investment contract," there is an issue as to whether Plaintiffs made an "investment of money" as required by the first prong of the *Howey* analysis. *See Hocking*, 885 F.2d 1449 at 1459 ("Admittedly, there would be an argument as to whether the 'investment of money' requirement had been met if someone who already owned a condominium decided to place the condominium into a rental arrangement. . . .")

As before, Plaintiffs rely heavily on the SEC amicus brief in the appeal of *Salameh v. Tarsadia Hotels*, 2011 WL 1044129 (S.D. Cal. 2011). The amicus brief is not persuasive because it is based on different facts, not present here as Judge Dorr recognized. See *Obester* Order, Doc No. 45 at pp. 8-9 [describing that purchasers in *Salameh* were required to use the rental program operated or approved by the seller, and zoning required that unit be used for non-residential purposes.]

In contrast, in this case, there is **no** limitation on the number of days an Owner may use his condominium once it is purchased. The units are fit for residential use, as the one and two bedroom units have full kitchens. Even the studios have a refrigerator, sink and microwave. More significantly, only if a UMA is executed with Defendant Branson Landing Hotel L.L.C. (who is not the developer) is there any restriction on the number of days the owner may use unit. As Judge Dorr concluded, *Salameh* is inapposite.[6]

Prior SEC no action letters plainly support Defendants' position here. *See, e.g., SEC No Action Letter to Marco Polo Hotel Inc.*, 1987 WL 108553 (Sept. 30, 1987) (approving condo-tel where sales separated from rental); *SEC No-Action Letter to Intrawest Corporation*, 2002 WL 31626919 (Nov. 8, 2002) (approving sale of condo-tel where units not sold as investments, even if the purchasers later agreed to a rental program, so long as the rental program was optional and there was no rent pooling); *SEC No-Action Letter to FC Beach Joint Venture*, 1998 WL 278529 (May 29, 1998) (approving condo sales where rental program was not mandatory, there was no rent pooling, and the sales process was separated from the rental process, with optional rental contracts to be executed only after the purchase contracts).

---

[6] Moreover, in *Salameh*, the National Association of Realtors filed its own amicus, taking the position the District Court's opinion was correct. The brief may be found in the Obester matter at Doc No. 39.

The SEC has also previously approved condominium arrangements where the hotel operator exercised control over unit maintenance and operations. *See SEC No-Action Letter to One Central Park West*, 1995 WL 648105 (Nov. 2, 1995) (approval where purchasers were obligated to enter into a Hotel Unit Maintenance and Operation Agreement with the hotel manager to provide the hotel guests with the level of services associated with a luxury hotel, where as part of the agreements, the hotel manager issued room keys, among other things); *see also SEC No-Action Letter to Diamond Cove Assoc.*, 1990 WL 287055 (Sept. 27, 1990) (approval where management agreement between an affiliate of the developer and unit owners stated that affiliate would maintain all common areas, oversee the registration and departure of rental guests through enforcement of a standard check-in, check-out procedure).

### B. Plaintiffs Fail to Satisfy the Pleading Requirements

Plaintiffs make no effort to address either the PSLRA or the Supreme Court's decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007), discussed in the Defendants' Suggestions. Under the law, Plaintiffs must plead specific facts supporting scienter as to each defendant in a securities fraud case. In this matter, the more natural inference of scienter, which Plaintiffs have failed to overcome, is that the CPA, UMA and Declaration conformed to applicable law and SEC Release 5341, and Defendants had no intent to defraud.

Plaintiffs claim that facts specific to each Plaintiff's transaction are made, which refer to Paragraphs 77-164, not Paragraphs "zzzz." The particularity problem remains, however, because most of the referenced paragraphs do not describe any representations or omissions.

For example, Paragraphs 77-107 are grouped together under the heading, "Identification of Defendants and Operation of Entities." These paragraphs do not purport to describe fraud, with or without particularity. Paragraphs 134-157 are grouped under the heading "the Unit

Management Agreement" and recite the terms of the UMA, but refer to a UMA executed by an entity other than Branson Landing Hotel L.L.C., the party to the UMA at issue. Moreover, this section of the FAC does not identify any misstatements. Paragraph 146 attempts to postulate an omission by alleging "Defendants failed to disclose fees charged pursuant to the UMA," but the section provides no details as to *which* fees were omitted. This is important to know because, in fact, many fees were disclosed. See, Exhibits appended to the UMA at Ex. C. [describing reserve fund fees and cleaning fees.] Similarly, Paragraphs 158-164 appear under the heading "the Units." Again, these allegations do not refer to alleged misstatements or omissions.

Plaintiffs allegations of misrepresentations and omissions in Paragraphs 108-133 at least fall under the heading of "Misrepresentations and Omissions," but the requirements of F.R.C.P. 9(b) and the PSLRA are unmet as it is still unclear what was said by whom, and why any statement or omission was false. For example, Plaintiffs Andrew and Glenda Beach claim there were "several individuals responsible for the misrepresentations and/or omissions who were employees of HCW Realty and dates of occurrence are summer of 2006, [and] Plaintiffs cannot recall the specific dates but know that the representations occurred prior to signing the CPA." FAC, ¶ 173. Plaintiffs do not state why Defendant HCW Management Consultants LLC is responsible for whatever another Defendant [or employee thereof] said or did not say. More significantly, the Beaches signed the CPA on December 3, 2005. See Ex. D to Defendants' Motion, and Ex. E attached hereto. If representations were made *after* the signing of the CPA, then there can be no fraud as a matter of law.

Rule 9(b), and the PSLRA, are designed to protect Defendants from guessing games as to the claims asserted. The Plaintiffs' FAC fails to comply with these rules.[7] Both the PSLRA and

---

[7] Moreover, as discussed in the state law fraud section below, the Plaintiffs' only allegations of

F.R.C.P. 9(b) demand more than "in the interest of brevity and efficiency, Plaintiffs allege that all Plaintiffs heard similar or substantially similar facts." Plaintiffs' Brief at p. 14. Plaintiffs' First Amended Complaint should be dismissed.

### C. Plaintiffs' State Law Fraud Claims Fail as a Matter of Law

As noted above, Plaintiffs' allegations in the Misrepresentations/Omissions section of the FAC focus on four areas: representations concerning taxes, representations concerning Hilton, representations concerning the 50/50 split and representations concerning the daily fee. Each of these areas will be addressed in order below.

### 1. Representation Concerning Taxes

Assuming *arguendo* any statement about taxes was made, any such statement is a statement as to future action of a third party - the assessor - and not actionable under Missouri law. *See Massie v. Colvin*, 2012 WL 177591 at * 3 (Mo. Ct. App. S.D. Jan. 23, 2012). Plaintiffs made similar arguments in *Obester* and attempted to bolster their position by arguing it is a "well established rule that tax assessments differ for commercial and residential real property," citing MO. REV. STAT. § 137.016. *Obester*, Doc. 76, p. 19. If that is Plaintiffs' argument, and tax representations are in fact one of the representations giving rise to the claims of fraud in this matter, and assuming each Plaintiff heard and relied upon such a representation, Plaintiffs' fraud claims still fail because, as a general rule, any misrepresentation as to law is not actionable. *Bowles v. All Counties Inv. Corp.*, 46 S.W.3d 636, 639 (Mo. Ct. App. S.D. 2001).[8]

---

misrepresentations/omissions in paragraphs 108-133 center on four discrete areas: taxes, the role of Hilton, the revenue split in the UMA and fees to the hotel owner. These allegations fail to state a claim for the reasons described therein.

[8] There are exceptions to this general rule, as where there is a "special relationship" or defendant has "superior knowledge of the law," neither of which is pleaded in the FAC. The Motion addressing this specific argument has not yet been ruled in the *Obester* matter.

Case 6:12-cv-03081-DW   Document 45-1   Filed 10/22/12   Page 15 of 37

### 2.    Representations Concerning Hilton

Paragraphs 116-125 of the FAC complain that Defendants misrepresented that Hilton would manage the Hotel.  In fact, Hilton did manage the Hotel, as Plaintiffs' allegations demonstrate.  There is no fraud on these facts. The UMA (Plaintiffs' Ex. 6) describes that Branson Landing Hotel Company, L.L.C. may engage a professional management company to manage the Hotel and include the unit in Hotel inventory.  Id., Recital, ¶ C. That is exactly what happened.  Hilton managed the Hotel and the Rental Program.  No claim is stated.

### 3.    Representations Concerning the 50/50 Split

Plaintiffs' allegations concerning the revenue split are similarly disingenuous. Plaintiffs allege they were told orally and in writing that rental income would be split 50/50 with the rental operator "after all fees and costs were deducted." FAC, ¶ 126.  Indeed, the UMA in Paragraphs 4, 5, and 6 describe this revenue split and state unequivocally that there is a 12% charge for Services, [4(b)], that fees and costs relating to maintenance and cleaning will be deducted,[5(a-c)] and that a portion of rental revenues will be set aside for a Reserve Fund [ 5(d)] . Undeterred by the contract language, Plaintiffs complain in Paragraph 127 of the FAC that they received little-to-no revenue after the fees and expenses.  Plaintiffs then cite their Exhibit 12, which is a "sampling" of Plaintiffs' revenue statements.  If reference is made to the first page of that exhibit, on the bottom line, it is apparent Plaintiff Greg Smith received year-to-date payments of $20,203.15 *after* payment of the management fees and deduction of the expenses, which is exactly what the UMA describes. That Greg Smith may have had a mortgage, or had to pay taxes, thereby reducing his $20,000 income, cannot be the basis for fraud.  The UMA states unequivocally in Paragraph 6 that the Owner is responsible for his own mortgage payments, if

any, and taxes and insurance, along with other condominium related expenses.  In short, that

Plaintiffs did not receive as much rental income as they would like is not tantamount to fraud.

### 4.    Representations Concerning Daily Fee

Plaintiffs allege in Paragraph 131 that Defendants omitted to disclose the daily fee of

$38.00 which was imposed by the Hotel Owner. Plaintiffs' allegation, however, fails to note that

Plaintiffs' Exhibit 11, the Purchaser's Acknowledgement, contains the following disclosures:

> **7.** The Owner of the Hotel (the "Hotel Owner") will provide front desk
> check-in, a telephone-switching system for the entire Hotel Building, basic
> cable television hook-up, ….basic Internet connectivity, …My Monthly
> Dues include payment to the Hotel Owner and the Master Association for
> the cost of the maintenance,  repair, replacement, upkeep …of these
> facilities. However, a daily fee is charged for the <u>use</u> of the facilities each
> day that my Unit is Occupied by me or my Guest. **These daily fees are
> <u>not</u> included in the Monthly Dues or Budget…. "**
>
>        *         *         *
>
> **9.** I  will be charged a Daily Service Fee covering daily housekeeping
> (including trash removal services),use of the front-desk facility, check-in
> services, parking, Unit reservations service, and the use, issuing, servicing
> and updating of the Unit entry key cards, as well as other indirect guest
> and comfort services provided to Unit Owners by the Hotel Owner for
> each day/night that my Unit is Occupied by me (or my guest).**The Daily
> Service Fee is not included in the Monthly Dues or in the Budget.**

A party has no duty to disclose information which has already been disclosed.  *Hess v.*

*Chase Manhattan Bank USA,* 220 S.W.3d 758, 765 (Mo. banc 2007).  A duty to speak only

arises where there is superior knowledge or information that is not readily available.  *Id.*  Here,

information about the daily fee was in fact provided.  Whether a duty to speak exists may be

determined as a matter of law on a motion to dismiss. *Bohac v. Walsh*, 223 S.W.3d 858 (Mo. Ct.

App. E.D. 2007).  Plaintiffs' allegations and exhibits defeat any duty to speak.

### 5.    Waiver

In the Opening Suggestions, Defendants urged that the disclosures in the contract

documents give rise to a waiver of the fraud claims.  Plaintiffs minimize the effects of the

binding contracts they signed by calling them "confusing." In fact, the documents are very easy

to read. The contracts contain integration clauses. *See* CPA, ¶¶ 16, 23; *see also* Purchaser's

Acknowledgement, ¶ 19. Contracts should be enforced according to their terms. Judge

Easterbrook of the Seventh Circuit explained it well:

> **A non-reliance clause is not identical to a truthful disclosure, but it has a similar function: it ensures that both the transaction and any subsequent litigation proceed on the basis of the parties' writings, which are less subject to the vagaries of memory and the risks of fabrication.**
> \* \* \*
> Prudent people protect themselves against the limitations of memory (and the temptation to shade the truth) by limiting their dealings to those memorialized in writing, and **promoting the primacy of the written word is a principal function of the federal securities laws.**
> \* \* \*
> **[Plaintiff] calls the no-reliance clauses "boilerplate," and they were; transactions lawyers have language of this sort stored up for reuse.** But the fact that language has been used before does not make it less binding when used again. **Phrases become boilerplate when many parties find that the language serves their ends. That's a reason to enforce the promises, not to disregard them**....
> Contractual language serves its functions only if enforced consistently. This is one of the advantages of boilerplate, which usually has a record of predictable interpretation and application. **If as [Plaintiff] says the extent of his reliance is a jury question even after he warranted his non-reliance, then the clause has been nullified, and people in [Plaintiff's] position will be worse off tomorrow**....

*Rissman v. Rissman*, 213 F.3d 381, 384-85 (7th Cir. 2000) (citations omitted) (emphasis added).

This rule is not unique to the Seventh Circuit and has been applied in the hotel

condominium context. In both the *Garcia v. Santa Rosa*, 528 F.Supp.2d 1283 (S.D. Fla. 2007) and

*DeMarco v. LaPay,* 2009 WL 3855704 (D. Utah 2009) cases cited in the Opening Suggestions,

the trial courts dealt with clauses almost identical to those found in the CPAs here. In both cases,

the courts concluded the plaintiffs' claims must be dismissed because of the contract clauses.

With respect to waiver specifically, Plaintiffs acknowledge the rule set forth in *Anselmo*

*v. Manufacturer's Life Insurance Co.*, 771 F.2d 417 (8th Cir. 1985) that, once a plaintiff is made

aware of a fraud and enters into a new agreement with the alleged perpetrator concerning the same subject matter as the fraud, the plaintiff waives any fraud claim. Doc. 33, p. 15. Plaintiffs argue this rule has no application here because, when Plaintiffs signed the CPAs, the hotel was not yet built. According to Plaintiffs, "on November 1, 2005, there was not any possible way for the Andrew's to investigate the truth or falsity of the documents as their hotel room did not exist as it is on the twelfth floor of a building that did not even have a foundation . . . " *Id.* at p. 16.

Plaintiffs' argument misses the mark entirely. Whether or not a single millimeter of the structure's foundation was poured is absolutely irrelevant to the issue of waiver. The completion of the hotel's construction and the commencement of hotel operations would not have revealed anything to Plaintiffs that they could not have discovered by simply sitting down and reading the documents they signed, namely the CPA and Purchaser's Acknowledgment. Well before construction began, Plaintiffs had before them the means to discover the alleged fraud.

The Andrews signed the CPA and Purchaser's Acknowledgement on November 1, 2005. The CPA, which the Andrews acknowledged they read and understood, expressly disclaimed any agreements, promises or representations not set forth or referred to therein. *See* Doc. 21-1, ¶¶ 23-24. The Purchaser's Acknowledgement, attached to the CPA, contained nineteen specific affirmations, acknowledgements and consents (all as more fully set forth in Defendants' Suggestions in Support, Doc. 21), each of which was initialed by the Andrews, and many of which were directly contrary to the alleged oral representations in key respects. See Doc. 21-2.

The explicit disclosures in the CPA and Purchaser's Acknowledgment put Plaintiffs on actual, constructive, and/or inquiry notice that the facts were not as they allegedly believed them to be. Simply reading these documents would have disclosed a variance between the actual terms of the parties' agreement and the alleged oral representations. "Parties are presumed to

read what they sign." *Warren v. Paragon Tech. Group, Inc.*, 950 S.W.2d 844, 846 (Mo. banc 1997). "Those who sign a contract have a duty to read it and may not avoid the consequences of the agreement on the basis that they did not know what they were signing." *Grossman v. Thoroughbred Ford, Inc.*, 297 S.W.3d 918, 922 (Mo. Ct. App. W.D. 2009). It matters not whether Plaintiffs actually read the documents. "Where there is a duty of finding out and knowing, negligent ignorance has the same effect in law as actual knowledge." *Golden v. Nat'l Utilities Co.*, 201 S.W.2d 292, 297 (Mo. 1947) (quoting 20 RULING CASE LAW, pp. 346-347).

Plaintiffs attempt to distinguish *Lingo v. Hartford Life Insurance*, 2011 WL 1642223 (E.D. Mo. May 2, 2011) on two grounds. The first is "the plaintiff [in *Lingo*] could have immediately discovered the error by reading the documents prior to signing them . . ." Doc. 33, p. 16. This purported point of distinction is disingenuous, as Plaintiffs had the same opportunity to discover the alleged fraud merely by reading the CPA and Purchaser's Acknowledgment prior to signing them. The second purported distinction is the Plaintiff in *Lingo* "would have begun making payments on the mortgage shortly after signing the documents", whereas "Plaintiffs were merely signing a preconstruction contract to purchase a hotel room that had not yet been built . . ." *Id.* at pp. 16-17. Again, whether the hotel had been built is irrelevant where Plaintiffs had the means to discover the alleged fraud by reading the CPA and Purchaser's Acknowledgment.

Plaintiffs attempt to distinguish *Luli Corp. v. El Chico Ranch, Inc.*, 481 S.W.2d 246 (Mo. 1972) and *Ringstreet Northcrest Inc. v. Bisanz*, 890 S.W.2d 713 (Mo. Ct. App. W.D. 1995) on the grounds that "Plaintiffs have not plead that Defendants breached any warranty made in the real estate contracts." Doc. 33, p. 17. This distinction is devoid of merit as neither case involved a suit for breach of warranty. *Luli Corp.* was an action for rescission of a land sale contract on grounds of fraudulent misrepresentation. 481 S.W.2d at 247. *Ringstreet* was an

action for fraudulent non-disclosure. 890 S.W.2d at 719. *Luli Corp.* held that an explicit disclaimer as to the acreage of the property at issue vitiated the purchasers' claim for fraud arising out of an earlier misrepresentation as to the amount of acreage. 481 S.W.2d at 255. *Ringstreet* relied in part on a contractual disclaimer of reliance upon any "warranties, representations or statements" to hold that the seller had no duty to disclose a problem with bursting pipes and that the purchasers' claim failed as a matter of law. 890 S.W.2d at 724-25.

The CPA and Purchaser's Acknowledgement contained multiple disclosures and disclaimers. Importantly, the terms and conditions of the CPA state "any agreements, promises or representations not set forth or referred to in this Agreement are of no force and effect" and "[n]either party shall be bound by any verbal representations altering the terms of the Agreement." See Doc. 21-1, ¶¶ 16, 23. These provisions are very similar to the contractual disclaimer at issue in *Ringstreet*, 890 S.W.2d at 722, and should be given the same effect.

Under the authority of *Lingo*, *Luli Corp.*, and *Ringstreet*, the specific disclaimers in the CPA and Purchaser's Acknowledgment bar Plaintiffs' fraud claims. At the very least, Plaintiffs waived any fraud claims relating to guarantees of rental income, investment benefits, or fees and charges when they signed the UMA. The majority of Plaintiffs had the benefit of approximately two years to study the provisions of the CPA and Purchaser's Acknowledgement prior to signing the UMA. As stated previously, Plaintiffs had a duty to read those documents and, even if they did not, they are deemed to have actual knowledge of their contents. *Grossman*, 297 S.W.3d at 922; *Golden*, 201 S.W.2d at 297. With knowledge of the facts allegedly constituting fraud, Plaintiffs chose to enter into the UMAs, which concerned the same subject matter as the prior agreements. Plaintiffs have, therefore, conclusively waived their claims for fraud with respect to the rental program, which is the crux of their lawsuit. *See Anselmo*, 771 F.2d at 420-21.

Plaintiffs make several random arguments in the waiver section of their Suggestions in Opposition that are of questionable relevancy. Nevertheless, Defendants will address the inaccuracy of those arguments. Plaintiffs argue they did not "purchase" their units when the CPA was signed, but rather purchased their units at closing, after construction was complete. See Doc. 33, p. 18. Earlier in their Suggestions in Opposition, Plaintiffs argued that "signing the UMA completed their transaction with Defendants in purchasing the condotel unit." *Id.* at 16.

Plaintiffs' argument that the purchase did not occur until closing ignores the well-settled principle of Missouri law that, "[t]he relation of vendor and purchaser exists as soon as the contract for the sale and purchase of land is entered into. Thereafter, equity regards the purchaser as the owner and the vendor as holding the legal title in trust for him." *Shelter Mut. Ins. Co. v. Crunk*, 102 S.W.3d 560, 564 (Mo. Ct. App. S.D. 2003) (citation omitted). When Plaintiffs entered into the CPAs, they had effectively purchased the units and were the equitable owners thereof, despite the fact that closing was delayed to a future date.

Plaintiffs' alternative argument is also incorrect. The UMA did not in any way "complete" Plaintiffs' purchase of the condotel unit. Participation in the rental program was not a condition precedent to the purchase of a condotel unit; it was completely voluntary, as was disclosed in the Purchaser's Acknowledgment and the UMA itself. See Doc 21-2, ¶ 19; Doc. 21-3, ¶ 22. The UMA may have been the last agreement entered into between Plaintiffs and Defendants relating to the condotel units Plaintiffs had purchased, but it certainly did not "complete" the purchase transaction as it was not even part of the purchase transaction.

Finally, Plaintiffs claim they "have not found a clear disclosure of the daily fee until they were given the Orientation Guide after purchase." Doc. 33, p. 18. However, as discussed above, Purchaser's Acknowledgment twice informed Plaintiffs of their obligation to pay Daily Services

Fees. The disclosure of the daily fee could not be any clearer. If Plaintiffs' complaint is that the *amount* of the fee was not revealed in the Purchaser's Acknowledgment, they should have made inquiry upon receiving the Purchaser's Acknowledgement as to the amount of the fee. They could have then chosen whether to go forward with the transaction. The fact that Plaintiffs sat on their hands until receiving the Orientation Guide is no fault of Defendants.

### D. Plaintiffs Fail to State a Claim under the Merchandising Practices Act.

Plaintiffs' Suggestions in Opposition cite no cases in support of the MPA claim, or any cases opposing *Saey v. CompUSA, Inc.*, 174 F.R.D. 448 (E.D. Mo. 1997), cited in Defendants' Suggestions. In *Saey,* the court dismissed a claim where an individual purchased a computer for business, not personal, use. Plaintiffs are the master of their own pleading. Plaintiffs allege they purchased the condominiums for "investment purposes." Plaintiffs do not allege they bought the condominiums for personal, family or household use as required by the MPA. For this reason alone, the claim must be dismissed.[9]

### E. Defendants Did Not Breach any Fiduciary Duty

In their Brief, but not in the FAC, Plaintiffs suggest that a real estate broker and client have a fiduciary relationship. However, there are no allegations in the FAC as to whether any particular defendant was the Plaintiffs' real estate agent, nor can there be.[10] Plaintiffs'

---

[9] Defendants do not abandon their other arguments supporting the dismissal of the claim as set out in the Opening Suggestions. Defendants respectfully submit Plaintiffs' Suggestions in Opposition do not give rise to a need for further argument on these points.

[10] Defendants would note that, should Plaintiffs survive Defendants' Motion to Dismiss on statute of limitations and other grounds, the evidence will ultimately show that most, if not all, of the named individuals had no active real estate licenses until mid-to-late 2007 and, therefore, no fiduciary relationship could have existed on this basis for those purchases made in early 2007 or prior thereto.

allegations regarding their specific transaction reveal only that the individuals who made the representations were "employees" of HCW Realty. *See* ¶¶ 165-368.

Neither the Court nor the Defendants should have to assume a fiduciary relationship existed between the Plaintiffs and any or all Defendants. "[T]he existence of a business relationship does not give rise to a fiduciary relationship or to a presumption of such a relationship." *Lucas v. Enkvetchakul*, 812 S.W.2d 256, 261 (Mo. Ct. App. S.D. 1991). Moreover, the bare allegation that the individuals named in the FAC are "licensed real estate agents" is insufficient to establish the existence of a fiduciary duty. "In a real estate transaction, the fiduciary duty of the agent is defined by [MO. REV. STAT. § 339.710—MO. REV. STAT. § 339.860]." *Dancin Dev., L.L.C. v. NRT Missouri, Inc.*, 291 S.W.3d 739, 745 (Mo. Ct. App. E.D. 2009); *see also* MO. REV. STAT. § 339.840. To whom a fiduciary duty is owed is governed by different statutory sections, depending upon the capacity in which the agent is acting—*see, e.g.,* MO. REV. STAT. §§ 339.730 (seller's agents), 339.740 (buyer's agents), and 339.755 (transaction brokers). The default status is that of "transaction broker." *See* MO. REV. STAT. § 339.720; *see also* 18 MISSOURI PRACTICE § 11:6 (3d ed.). A transaction broker may provide real estate services "to any party in a prospective transaction without an agency or fiduciary relationship to one or more parties to the transaction." MO. REV. STAT. § 339.755.1; *see also* MO. REV. STAT. § 339.710(23). Without more, the allegation that the individuals named in the SAC are "licensed real estate agents" does not suffice to establish that they owed Plaintiffs a fiduciary duty.

Not only is the existence of a fiduciary duty inadequately pleaded in the FAC, the allegations referred to in the FAC do not support such a duty. To the contrary, the FAC alleges BLR Realty sold the condominium units for the Developer, which implies it was *not* acting as the real estate agent for the Plaintiffs. *See, e.g.,* FAC ¶ 60 ("Defendants' sales teams falsely

represented to Plaintiffs that the rental program would be arranged…").  With respect to those

Plaintiffs who purchased from the Developer (the vast majority of the Plaintiffs), the CPAs,

Purchaser's Acknowledgments, COSCs, and FAQ Sheets contain absolutely no reference to

anyone acting as a real estate agent either for the Plaintiffs or the Developer.

 In fact, Paragraph 19 of the "Terms and Conditions", attached to the CPAs, states:

o  <u>BROKERS,</u> **The Purchaser(s) represent that, except as set forth on Addendum A, no broker or finder has been engaged in connection with this transaction** and should any claim be made for commissions or finder's fees by any broker or finder, through or on account of Purchaser, then Purchaser(s) will indemnify and hold the Seller Harmless from and against any such claim and all loss, liability, cost, damage and expense in connection therewith.  The provisions of this Section shall survive the closing.

See Ex. A to Defendants' Suggestions (emphasis added).

In light of Plaintiffs' bare bones allegations in the FAC, which are directly contradicted

by the language of the CPA, one cannot infer that a fiduciary relationship existed between

Plaintiffs and Defendants without resort to speculation.  To survive a motion to dismiss,

"[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  For all of the reasons described in the

earlier brief, and by Judge Dorr in his *Obester* order, the breach of fiduciary duty claim must be

dismissed as to all Defendants.

## F.     Plaintiffs Fail to State a Claim Against Huffman.

Again, Plaintiffs' Suggestions do not address any of the statutes or cases cited in

Defendants' Suggestions. There is no private right of action for a violation of the fictitious name

statute.  Plaintiffs have not pled any harm.  Plaintiffs have no claim against Richard Huffman

individually.

## G.     Plaintiffs Claims Against Hilton Fail

Plaintiffs claim they thought they were dealing with Hilton, but Plaintiffs' unilateral

belief does not make a contract. The UMA unambiguously identifies the parties to the contract: Plaintiffs and Branson Landing Hotel, L.L.C. Hilton was not a party to the contract. The UMA describes that Branson Landing Hotel, L.L.C. may retain a management company, which it did (Hilton). There is no "undisclosed" agency as Plaintiffs suggest.

Finally, if Plaintiffs want to sue for breach of contract, they must honor the terms of the contract. Here, the remedy is limited: paragraph 19 of the UMA provides the sole remedy for the breach which does not include the filing of the lawsuit. Plaintiffs remedy is to terminate the UMA after providing notice and an opportunity to cure.

### H. Plaintiffs Waived Their Right to a Jury Trial

The jury trial waiver in the CPA is broad and reaches claims against "ANY OTHER PARTY ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT." Def. Ex. 3, ¶ 31. As the Agreement is between the "Purchaser" and the "Seller," the reference to "any other party" includes those other than the "Purchaser" or "Seller." Unambiguous and plain jury trial waivers are enforceable under the authority cited in Defendants' opening brief. Defendants contend that Plaintiffs who signed the CPAs waived their right to a jury trial. [11]

### I. Plaintiffs' Claims Are Barred by the Statutes of Limitations

It must be noted that there is no Tolling Agreement between the parties relating to these claims. Rather, Plaintiffs argue the contract was not complete until all documents were signed and the transaction had closed. They do not rely on any fraudulent concealment or equitable

---

[11] Plaintiffs allege three Plaintiffs signed standard Missouri Real Estate Contracts, not the CPAs. Thus, these three Plaintiffs did not buy from Defendants, and their claims should be dismissed for that reason. Defendants acknowledge the jury trial waiver argument applies only to individuals who signed documents containing the waiver. Defendants also preserve their argument that trial must be severed for each Plaintiff.

Case 6:12-cv-03081-DW   Document 45-1   Filed 10/22/12   Page 26 of 37

tolling.[12] Plaintiff's argument is wrong.

## 1. Counts I, II and IV are Time Barred

"[A] sale [of a security] occurs for §12 purposes **when 'the parties obligate themselves to perform** what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time.'" *Finkel v. The Stratton Corp.*, 962 F.2d 169, 173 (2nd Cir. 1992) (emphasis added).The CPA/Purchaser's Acknowledgement establishes the obligation to purchase the condominium, and is defined by the Plaintiffs as the "investment contract" in the FAC. See ¶ 383. Accordingly, the statute runs at the time the CPAs were signed.

Equitable tolling does not apply to "failure to register" claims, as found in Counts I, II and IV. *Meadows v. Pac. Inland Secs. Corp.*, 36 F.Supp.2d 1240, 1251 (S.D. Cal. 1999) ("[S]ince the registration, or lack thereof, of securities is a public record and easily discovered, it is inappropriate to apply the equitable tolling doctrine to a claim brought for failure to register securities.").

Plaintiffs, who bought from the developer via the CPA [all but three Plaintiffs], executed their CPA's, the "investment contract," more than three years prior to the filing of the Complaint on February 13, 2012. The claims are thus untimely under the three-year/one year statute of limitations.[13] The plain language of the CPA shows that it created a binding obligation for

_____

[12] In order to properly plead fraudulent concealment or equitable tolling, particularized allegations concerning concealment of the fraud are required. *See Summerhill v. Terminix Inc.* 637 F.3d 877 (8th Cir. 2011). Defendants submit that Plaintiffs' allegations in Paragraphs 43-48 are insufficient under this standard.

[13] The three resale Plaintiffs, to the extent they could conceivably have a claim, present a more difficult question because they did not buy a unit from the "Defendants" and hence did not sign a CPA. Even under the Plaintiffs' argument, their claims are barred if their UMAs were executed prior to February 13, 2011 [one year from discovery] because the UMAs contain disclosures which parallel the disclosures in the CPAs regarding no promises of rental income, and no requirement to place the Unit in the rental program.

Plaintiffs to purchase the condominiums, with or without execution of the optional UMA. Under the prevailing authority, this obligation constitutes the trigger for the statute of limitations as Judge Dorr ruled in *Obester*.

### 2. Plaintiffs' Inquiry Notice at the Time They Signed the CPA's Bars Counts III and V

As noted in the Opening Brief, Plaintiffs' claims are barred by the five-year outside limitation period applicable to the 1934 Act claims. There is no question that the five-year statute of repose bars the claims of all but three Plaintiffs. Moreover, a plaintiff in a federal securities lawsuit is deemed to have discovered fraud for purposes of triggering the applicable statute of limitations not only when the plaintiff actually discovers the alleged fraud, but also when a reasonably diligent plaintiff would have discovered the fraud. *Merck & Co., Inc. v. Reynolds*, 130 S.Ct. 1784, 1798 (2010).

The determination of whether "inquiry notice" of federal securities fraud exists is an objective standard based upon facts known to the plaintiff; i.e. when the plaintiff is aware of facts that would lead a reasonable person to investigate and consequently acquire actual knowledge of the alleged fraudulent conduct. *Ritchey v. Horner*, 244 F.3d 635 (8th Cir. 2001); *Great Rivers Coop. of Southeastern Iowa v. Farmland*, 120 F.2d 893, 896 (8th Cir. 1997); *Cohen v. New Growth*, 385 F.Supp.2d 935, 945 (D.S.D. 2005). Inquiry notice exists when there are "storm warnings" that would alert a reasonable person of the possibility of misleading information, disseminated either by an act or by omission. *Id*. Where the complaint itself contains facts needed to make a determination regarding whether a reasonable investor of ordinary intelligence would have been aware of the existence of the alleged fraud, a court may properly rule on the issue of inquiry notice on a motion to dismiss. *Cohen*, 385 F.Supp.2d at 945.

Paragraph 383 of the FAC states, "*Defendants' investment contract… included the following language specifically designed to conceal the fact Defendants were selling unregistered Securities:*

> **19. NO SALES REPRESENTATIVE PROMISED THAT THE PRUCHASE [sic] OF A UNIT WOULD PROVIDE A RETURN ON INVESTMENT OR TAX ADVANTAGES. PARTICIPATION IN ANY RENTAL PROGRAM THAT MAY BE OFFERED IS NOT MANDATORY AND I MAY CHOSE(SIC) TO ENTER THE RENTAL PROGRAM OF MY OWN VOLITION AT A LATER DATE. NO REPRESENTATION HAS BEEN MADE TO ME AS TO THE AMOUNT OF ANY GROSS RENTAL INCOME, THE NUMBER OF NIGHTS THE UNIT WILL BE RENTED, OR THE AVERAGE DAILY RENTAL PRICE, IF ANY.**

If Defendants' "investment contract," which Plaintiffs are presumed to have read, and **in fact initialed nineteen times**, was at odds with what Plaintiffs thought they were buying, Plaintiffs were unequivocally on *actual* notice ─ not even inquiry notice ─ of the alleged fraud, and their claims are barred for purchases more than two years before February 28, 2009. *See* Ex 5.

This same analysis applies with equal force if reference is made to the UMA signed by the Plaintiffs in 2007[14]. Paragraphs 4-6 of the UMA describe the management fee, the other fees and expenses, and the responsibility of the Unit Owner to pay mortgage, taxes and insurance.

### 3. Plaintiffs' State Law Fraud Claims are Barred by the Five-Year Statute of Limitations

---

[14] Ex. D reflects that a few Plaintiffs signed the UMA after 2007: Evans Renovations[#9] signed 12/10/2008; LD Valley[#15] signed 12/27/08;Ragat Family Trust[#23] signed 3/17/08; Stanley/Norma Ryan[#27] signed 12/18/08;Sunbelt[#32] signed 1/16/09. All of these Plaintiffs' claims are time-barred because they signed the UMA more than two years prior to the filing of the Amended Complaint. Moreover, they clearly came to the transaction after the Hotel was open and running and Plaintiffs' argument that individuals could not know about what was going on until the Hotel was finished and opened is not applicable.

The pertinent statute of limitations for Counts VI-X is five years, pursuant to MO. REV. STAT. § 516.120(5). On Page 25 of their Suggestions in Opposition (Doc. 33), however, Plaintiffs cite to MO. REV. STAT. § 516.100, which states:

> Civil actions . . . can only be commenced within the periods prescribed in the following sections, after the causes of action shall have accrued; provided, that for the purposes of sections 516.100 to 516.370, the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment . . .

Plaintiffs then argue "[n]o damages were ascertainable until the hotel began operation and Plaintiffs discovered how the rental income was being divided by Defendants." (Doc. 33, p. 25). Plaintiffs' argument is erroneous. Section 516.100 does not apply to causes of action for fraud and does not determine when a cause of action for fraud accrues. *Schwartz v. Lawson*, 797 S.W.2d 828, 832 (Mo. Ct. App. W.D. 1990) ("An action for relief on the ground of fraud, however, accrues—not when the resulting damage is capable of ascertainment—but when the facts constituting the fraud are discovered. It is governed not by the limitations provisions of § 516.100, but by the limitations provisions of § 516.120(5) [.]")

Pursuant to Section 516.120(5), a plaintiff has five years to bring "[a]n action for relief on the ground of fraud, the cause of action in such case to be deemed not to have accrued until the discovery by the aggrieved party, at any time within ten years, of the facts constituting the fraud." Missouri courts "have consistently interpreted the term 'discovery' as used in § 516.120(5) RSMo . . . to mean actual or constructive knowledge." *Gilmore v. Chicago Title Ins. Co.*, 926 S.W.2d 695, 698 (Mo. Ct. App. E.D. 1996). The limitations period commences "when plaintiff 'discovered or in the exercise of due diligence, should have discovered the fraud.'" *Community Title Co. v. U.S. Title Guar. Co.*, 965 S.W.2d 245, 252 (Mo. Ct. App. E.D. 1998) (citations omitted). A plaintiff must "act with due diligence to discover 'the facts constituting the fraud.'" *Sharpe v. Sharpe*, 243 S.W.3d 414, 417 (Mo. Ct. App. E.D. 2007) (citation omitted).

"Where the means for discovery exist, a plaintiff is deemed to know of the fraud, so that the period of limitations commences to run then." *Id.*; *see also Corley v. Jacobs*, 820 S.W.2d 668, 672 (Mo. Ct. App. E.D. 1991).

Plaintiffs argue they could not have discovered the facts constituting the alleged fraud until the hotel began operating in August 2007. See Doc. 33, p. 25. Plaintiffs could easily have discovered the alleged fraud simply by reading the documents they signed (the CPA and Purchaser's Acknowledgement) or were provided (the FAQ) at the time of purchase. Plaintiffs' failure to read these documents at the time of purchase, or in the ensuing two years (in the case of most Plaintiffs), is inexcusable and demonstrates an utter failure to exercise *any* diligence. To ignore these plain disclosures in the documents would render the "should have discovered" prong of the discovery rule dead letter and write the requirement that the plaintiff exercise due diligence in discovering the fraud out of Missouri law.

Throughout their Suggestions (Doc. 33), Plaintiffs repeatedly point to the fact that construction had not yet begun on the hotel as a reason for their inability to discover the facts allegedly constituting fraud, i.e. Plaintiffs should have been able to "wait and see" whether the actual operation of the hotel would conform to the earlier-in-time alleged oral representations or the subsequent written agreements. This argument is patently absurd.

The plaintiffs in *Nerman v. Alexander Grant & Co.*, 926 F.2d 717 (8th Cir. 1991)[15] made a similar argument. In December 1976, the plaintiffs invested as limited partners in a Kentucky coal mining venture. *Id.* at 719. The plaintiffs alleged that an accounting firm ("Grant") made various misrepresentations that fraudulently induced plaintiffs to invest in the venture, including that the investment would allow them to take a tax write-off worth several times their

---

[15] Interpreting Missouri law.

investments, and that there was no risk the tax deductions would be disallowed by the IRS. *Id.*

In February 1977, two months after Plaintiffs invested in the company, they received a one-hundred page memo setting forth various disclosures about the risks involved in the investment. *Id.* The memo disclaimed most, if not all, of the representations allegedly made by Grant in December 1976. *Id.* In particular, the memo disclosed that "the Internal Revenue Service would claim that some if not all of the deductions this Partnership will claim are not allowable; this means *every partner* of this Partnership should *assume* he will be audited." *Id.* at 719-20 (emphasis original). The memo further disclosed, "[t]here is a substantial risk that upon challenge, the deductions . . . could not be sustained by litigation." *Id.* at 720.

In spite of this warning, the Plaintiffs claimed their cause of action in fraud did not accrue until 1981 when the IRS notified them that their tax deductions, taken on their April 1977 returns, were disallowed. *Id.* The court disagreed:

> The plaintiffs knew, or should have known, after receiving the February Memorandum, that the Partnership in which they had invested was far from what Grant allegedly represented to the plaintiffs in December of 1976. . . . They knew *then* that the tax deduction was far from safe, contrary to the alleged representation that there was no risk of a disallowance.
> . . .
> Perhaps it was reasonable for the plaintiffs to take a "wait and see" approach. But that election did not toll the statute of limitations. That is precisely the point of the statute of limitations: the plaintiffs had five years to "wait and see," and to decide whether to sue for fraud or live with the less-than-promised deal.

*Id.* at 721 (emphasis original).

The rational of *Nerman* is applicable here. Plaintiffs were provided with multiple documents that directly disclaimed the representations that were allegedly previously made to Plaintiffs. At that point, Plaintiffs knew or should have known that the hotel was not going to operate as they allegedly envisioned. Just as in *Nerman,* Plaintiffs in this case could not "wait

and see" whether the hotel would operate in conformance with the alleged oral representations in the face of explicit disclaimers to the contrary in the documents they signed at purchase.

*Armbrister v. Roland International Corp.*, 667 F.Supp. 802 (M.D. Fla. 1987) also presents facts analogous to those at issue herein. In *Armbrister*, the plaintiffs claimed the defendants engaged in a scheme to defraud the plaintiffs by misrepresenting the nature and value of land the plaintiffs purchased in Florida which was in fact uninhabitable swamp land. *Id.* at 805-06. The plaintiffs alleged the defendants misrepresented: (1) that the defendants would resell the property as a whole in three to seven years (*Id.* at 814); (2) that the plaintiffs would make money on their purchase; and (3) that the land was suitable for development. *Id.* at 814, 816, 819-20. However, a Public Offering Statement (PSO) accompanying each sales contract, which the plaintiffs were required to read and sign, stated:

> …The property described herein is not suitable for building purposes. It is unimproved, unsurveyed acreage without roads, drainage, or other improvements. 35% of the property is swampy bayhead, and is subject to flooding. The seller is not obligated to provide any improvements….All mineral rights…have been reserved…Polk County, Florida has not promised or agreed and does not intend to provide streets, drainage, water, utilities or any other improvements to this land.

*Id.* at 807-08. The POS disclosed that the future value of the land is very uncertain, warning purchasers "do NOT count on appreciation." *Id.* at 808. It disclosed the developer does not engage in reselling the purchaser's property and makes no representation regarding the purchaser's ability to resell his property. *Id.*

The POS invited purchasers to ascertain for themselves whether the property met their requirements and expectations, and warned purchasers not to sign unless they had read it. *Id.* The sales contract itself disclosed that the property was unimproved, unsurveyed, and subject to flooding. *Id.* The sales contract also stated: "This purchase agreement and attached rider(s) if

Case 6:12-cv-03081-DW   Document 45-1   Filed 10/22/12   Page 33 of 37

any, constitute the entire agreement and Purchaser acknowledges that no additional representations have been made." *Id.* at 808-09.

Plaintiffs sued Defendants for common law fraud, which in Florida requires that the action be brought "within four years '…running from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence…..'" *Id.* With respect to the plaintiffs' duty to exercise due diligence, the court stated:

> Plaintiffs did absolutely nothing to investigate the quality and value of the land they purchased, or to follow up on the representations made to them by use of high pressure sales techniques. In fact, <u>Plaintiffs clearly ignored written disclosures which should have put them on notice that the "puffing" utilized by the salesmen was suspect, and that the land involved might not be a desirable or sensible purchase. Clearly, Plaintiffs were on inquiry notice due to the disclosures in the Public Offering Statements, and in the contracts for sale.</u>

*Id.* at 812 (emphasis added). The court determined the alleged fraud "could have and should have been discovered at the time of the initial sales contract, or in the four years following that contract." *Id.* The court further stated, "[t]he record, taken as a whole, clearly establishes that all Plaintiffs should have known, with the exercise of *any* diligence, that their land purchases were suspect, within four years of the date each contract for purchase and its accompanying Public Offering Statement was signed." *Id.* (emphasis original). For each plaintiff, the Court determined the statute of limitations began on the date each plaintiff signed the contract of sale and/or public offering statement. *Id.* at 813-21. The court held the common law fraud claim was "clearly barred by the statute of limitations, as to all Plaintiffs." *Id.* at 812.

Here, as in *Armbrister*, a cursory review of the CPA, Purchaser's Acknowledgement, and accompanying documents (the FAQ) would have put Plaintiffs on actual, constructive, and/or inquiry notice that the terms of their agreement were not as they allegedly believed them to be.

Therefore, where the CPA and/or Purchaser's Acknowledgment was signed on or before February 13, 2007, the claims arising from that purchase are barred by the statute of limitations.

In an attempt to save their causes of action sounding in fraud, Plaintiffs assert that "all applicable statute of limitations have been tolled." Doc. 33, p. 26. In order to toll the statute of limitations for fraud, facts must be alleged showing affirmative action on the part of the defendant to conceal the fraud. *Cullom v. Crittenton*, 959 S.W.2d 915, 919 (Mo. Ct. App. 1998). Moreover, "[t]here can be no concealment which will prevent the running of the statute of limitations where the cause of action is known to the plaintiff or there is a presumption of such knowledge." *Hasenyager v. Bd. of Police Com'rs of Kansas City*, 606 S.W.2d 468, 471 (Mo. Ct. App. W.D. 1980), quoting 51 Am.Jur.2d, Limitation of Actions, Section 148, p. 719.

Plaintiffs allege in their FAC that "[a]ll applicable statute of limitations of state and federal law have been tolled until Plaintiffs discovery of either the facts that lead to the cause of action accruing or the actual accrual of the cause of action" *See* FAC, ¶ 43. In support of this conclusory allegation, the FAC states: many Plaintiffs made purchase of the unit/securities pre-construction (¶ 44); defendants began selling the unit/securities in 2005 and the hotel did not open until late 2007 (¶ 45); when Plaintiffs signed Contract Purchase Agreements (CPA) they were relying solely upon what they were being told by Defendants' sales agents as construction had not been completed (¶ 46); the Declaration of the Penthouse Condominiums was not recorded until August 21, 2007 (¶ 47); and the transactions Plaintiffs were entering into were not complete until they signed the Unit Management Agreements (UMA) just prior to the hotel opening in late 2007 (¶ 48). Plaintiffs' tolling argument is redundant of their arguments relating to the accrual of their cause of action for fraud and, to that extent, must fail for the same reasons.

Additionally, Plaintiffs' allegations show no affirmative act on the part of Defendants to conceal any fraud. At most, the allegations show silence on the part of Defendants for a period of two years. Silence alone is not sufficient to toll the statute of limitations:

> [S]omething more than silence, or mere general declarations or speeches, on the part of the person liable, must be shown. It must appear that some trick or artifice has been employed to prevent inquiry or elude investigation or calculated to mislead and hinder the party entitled from obtaining information, by the use of ordinary diligence, that a right of action exists; or it must appear that the facts were misrepresented to or concealed from the party, by some positive acts or declarations, when inquiry was being made or information sought, and the particular acts of concealment or misrepresentation must be set out in the pleading. . . .

*Brown v. Irving-Pitt Mfg. Co.*, 292 S.W. 1023, 1029 (Mo. 1927) (citation omitted). Plaintiffs may have failed to read the CPA and Purchaser's Acknowledgement, or to inquire further of Defendants prior to the completion of construction, but Plaintiffs do not allege any specific acts on the part of Defendants that prevented them from doing so. This is fatal to any tolling argument.

Even assuming Plaintiffs adequately pled facts that would support tolling, and further assuming Plaintiffs did not have actual knowledge of their cause of action for fraud until the hotel began operation, they were still *presumed* to have such knowledge, as they are presumed to have read what they signed. *Warren v. Paragon Tech. Group,* 950 S.W.2d 844, 846 (Mo. banc 1997). The CPA and Purchaser's Acknowledgements clearly disclose the facts were not as they were allegedly represented to Plaintiffs. Where the means for discovery exist, a plaintiff is deemed to know of the fraud. *Sharpe*, 243 S.W.3d at 417. By virtue of the CPA and Purchaser's Acknowledgment, both of which Plaintiffs could have examined any time before or after signing, Plaintiffs are presumed to have had knowledge of their cause of action for fraud and, as a matter of law, there can be no concealment that would toll the statute of limitations.

## III. CONCLUSION

Defendants' Motion to Dismiss should be granted, as Plaintiffs fail to state any claims.

Even if Plaintiffs state a claim, the claims are time-barred.

Respectfully Submitted,

_____/s/_____
Michael K. Cully        MO 26794
Angela K. Drake         MO 35237
Matt Growcock           MO 56985
LOWTHER JOHNSON
901 St. Louis, 20th Floor
Springfield, Missouri  65806
(417) 866-7777 – Telephone
(417) 866-1752 – Facsimile
mcully@lowtherjohnson.com
adrake@lowtherjohnson.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 5th day of October, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing via electronic mail to all counsel of record

_____/s/_____